UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:08-CV-25-F

| | | |
|---|---|---|
| ABB, INC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | O R D E R |
| | ) | |
| CSX TRANSPORTATION, INC., | ) | |
| Defendant. | ) | |

Plaintiff, ABB, Inc. ("ABB"), filed this action against defendant, CSX Transportation, Inc. ("CSXT"), to recover monetary damages for alleged in-transit damage and loss to a large, expensive electrical transformer that CSXT shipped by rail in 2006, between ABB's manufacturing facility in St. Louis, Missouri, and ABB's customer's facility in Pennsylvania. ABB seeks to recover "the value of the actual loss or injury arising from damage to the transformer" pursuant to the Carmack Amendment, 49 U.S.C. § 11706 ("Carmack"), to the former Interstate Commerce Act; or, alternatively to recover all damages under Missouri common law for (i) breach of contract, or (ii) negligence. *See* Complaint [DE- 1], p. 6. Pending before the court are CXST's Motion for Summary Judgment as to ABB's substantive claims [DE-48.1], and as to its limitation of liability defense [DE-48.2]; and ABB's Cross-Motion for Partial Summary Judgment [DE-75] on the issue of CXST's alleged limitation of liability.

## I. Legal Standard

Summary judgment is authorized if the movant establishes that there is no genuine dispute about any material fact and the law entitles it to judgment. FED. R. CIV. P. 56(c). Disputes about material facts are "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). The Supreme Court has interpreted the plain language of Rule 56(c) to mandate the entry of summary judgment "after adequate time for discovery and upon motion, against a party who

fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the moving party meets this burden, Rule 56(c) requires the nonmovant to go beyond the pleadings and show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*). In reviewing the evidence "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

## II. Applicable Law

The underlying factual predicate for this lawsuit is best appreciated within the framework of the governing law. Thus, a preliminary description of the legal context in which this dispute arises best precedes a recitation of the facts.

Carmack creates "a national scheme of carrier liability for goods damaged or lost during interstate shipment under a valid bill of lading." *5K Logistics, Inc. v. Daily Express, Inc.*, 659 F.3d 331, 335 (4th Cir. 2011) (citation omitted); *see also York v. Day Transfer Co.*, 525 F. Supp.2d 289, 297 (D.R.I. 2007) ("The princip[al] purpose of the Carmack Amendment was to achieve national uniformity in the liability assigned to carriers.") (citation and internal quotation marks omitted). Rail carriers, governed by the Carmack provision in 49 U.S.C. § 11706, are a subset of the carriers covered by Title 49.[1] Under Carmack, a rail carrier of property in interstate commerce that damages or loses a shipment generally is liable "for the actual loss

---

[1] Motor carriers (the trucking industry) have their own Carmack provision in 49 U.S.C. § 14706(a)(1). The Carmack provisions for motor carriers are substantively identical in pertinent part to those governing liability for rail carriers. *See, e.g., KITO Group, Ltd. v. RF Int'l, Ltd.*, No. 3:09CV1371 (JBA), 2010 WL 2712138, slip. op. at * 2 (D. Conn. July 6, 2010). Accordingly, cases construing the relevant notice and limitation provisions may be interchangeable, or nearly so. *See id.* at n.3.

or injury to the property caused by" the carrier. 49 U.S.C. § 11706(a). Nevertheless, a carrier may limit its liability "to a value established by written declaration of the shipper or by a written agreement between the shipper and the carrier." *Id.* § 11706(c)(3)(A).

Here, ABB contends that CSXT is fully liable under § 11706(a) for all actual damages and losses incurred during CXST's shipment of the transformer pursuant to the bill of lading for that shipment, in a sum up to the "value" ABB placed on the transformer. CSXT denies the applicability of Carmack to the instant matter, but for purposes of the summary judgment motions, contends that it limited its liability to $25,000 for loss or damages to this shipment under Carmack's § 11706(c). That is, even if ABB could prove that CSXT is liable for damages to the shipment under Carmack,[2] CSXT contends that such liability may not exceed $25,000, regardless of the value of the transformer or the losses ABB may have incurred from damage thereto in transit. As CSXT filed the first motion for summary judgment, the court first will examine its limitation of liability affirmative defense. *See, e.g., Siemens Power Transmission & Distrib., Inc. v. Norfolk Southern Ry. Co.*, No. 6:02-CV-1024-Orl-22KRS, 2006 WL 5110365 (M.D. Fla. March 24, 2006). **In so doing, the court does not express any finding or opinion whether ABB can make a *prima facie* case under § 11706(a).**

A. Lexicon

As the terms are used herein, "shipper" refers to ABB. CSXT is both the "receiving carrier" and the "delivering carrier," pursuant to § 11706(a), Complaint [DE-1] ¶ 3. Duquesene Electric, ABB's customer who purchased the transformer, is the "consignee."

---

[2] To establish a prima facie case for damage to goods arising from the interstate transportation of goods by a rail carrier, a shipper must show (1) delivery of the goods in good condition, (2) receipt by the consignee of damaged goods, and (3) the amount of damages. *See Hoskins v. Bekins Van Lines*, 343 F.3d 769, 778 (5th Cir. 2003); *see also Missouri Pacific R.R. Co. v. Elmore & Stahl*, 377 U.S. 134, 138 (1964). If a *prima facie* case is established, the carrier may offer evidence that it limited its liability. *See Schoenmann Produce Co. v. Burlington Northern and Santa Fe Ry. Co.*, 420 F. Supp.2d 757, 762 (S.D. Tex. 2006) (internal citations omitted).

A "bill of lading" is a contract that records that a carrier has received goods from the shipping party, states the terms of carriage, and is evidence of a contract for carriage. *See Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 18-19 (2005). A bill of lading also is a receipt for goods to be transported, and usually contains the description, quantity and condition of the goods, their classification and, traditionally, reference to the carrier's filed "tariff." Although the carrier "issues" the bill of lading, it is not unusual for the shipper to prepare the document in the first instance, as ABB did here, using its own form. The bill of lading form used in this case is a non-negotiable, "straight bill of lading," and was both created and completed by ABB. It is referred to herein as "the BOL."

B. The Carmack Amendment & Full Carrier Liability

The Carmack Amendment, enacted as part of the former Interstate Commerce Act ("ICA"), refers collectively to federal statutory provisions governing freight carriers' liability for interstate shipments. These provisions "have at one time or another since 1906 resided in different sections of Title 49 of the United States Code." *North Am. Van Lines, Inc. v. Pinkerton Sec. Sys., Inc.*, 89 F.3d 452, 454 (7th Cir. 1996).[3] The Carmack provision applicable to rail carriers under § 11706(a)(1) codifies the common law rule that a carrier generally is liable for

---

[3] The particulars of Carmack's enactment, the industry's reaction thereto, subsequent amendments and various revisions, exceptions, and re-codifications thereof are intriguing and complex. *See, e.g., Babcock & Wilcox Co. v. Kansas City Southern Ry. Co.*, 557 F.3d 134 (3d Cir. 2009) (highlighting the development and differences among what have become known as "common carrier pricing arrangements" or "published rates" (formerly called "tariffs") governed by 49 U.S.C. § 11706 (Carmack); "rail transportation contracts," (or "private contracts") governed by 49 U.S.C. § 10709 (the Staggers Rail Act of 1980, or "Staggers"); and "exemptions" pursuant to 49 U.S.C. § 10502. Since deregulation in the mid-1990's, interstate carriers' pricing arrangements are overseen by the Surface Transportation Board ("STB") which replaced the Interstate Commerce Commission upon enactment of the Interstate Commerce Commission Termination Act, Pub. L. No. 104-88, 109 Stat. 803 (Dec. 29, 1995), *as amended*, Pub. L. No. 104-287, 110 Stat. 3390 (Oct. 11, 1996), codified at 49 U.S.C. § 11101, *et seq.* ("ICCTA"). Staggers private contracts and exempt contracts are not subject to the STB.

4

the actual loss or injury to the property.[4] That is, § 11706(a) requires the carrier to bear full

liability for the goods it transports, and essentially renders the carrier an insurer of safe delivery

under the terms of the bill of lading. *See, e.g., Rankin v. Allstate Ins. Co.*, 336 F.3d 8, 9 (1st Cir.

2003). The phrase, "Carmack Liability" is used herein to describe § 11706(a) full, and effectively

strict, carrier liability. However, as the facts of this case and many like it demonstrate, in

practice, most commercial rail shipments occur under the § 11706(c) exception to the

traditional full liability rule by which carriers offer much lower shipping rates in exchange for a

much lower and predetermined limitation of their liability.

C. The Exception is the Rule

In order to temper high shipping rates charged by carriers commensurate with full

Carmack Liability, Congress provided specifically for negotiation and agreement between the

parties to a rail shipping arrangement. Subsection § 11706(c)(1) provides an exception to the

statutory "default" of subsection (a) by permitting a rail carrier to limit its exposure to liability

for damages by agreement with the shipper.[5]

---

[4] In pertinent part, Carmack's subsection (a) codifying the common law "full liability" rule provides:

> (a) A rail carrier providing transportation or service subject to the jurisdiction of the [STB] under this part shall issue a receipt or bill of lading for property it receives for transportation under this part. That rail carrier and any other carrier that delivers the property . . . are liable to the person entitled to recover under the receipt or bill of lading. The liability imposed under this subsection is for the actual loss or injury to the property caused by –
> > (1) the receiving rail carrier;
> > (2) the delivering rail carrier.

[5] Title 49 U.S.C. § 11706(c) provides in pertinent part,

> (c) (1) A rail carrier may not limit or be exempt from liability imposed under subsection (a) of this section except as provided in this subsection. A limitation of liability or of the amount of recovery or representation or agreement in a receipt, bill of lading, contract, or rule in violation of this section is void.

* * * * *

5

---

*See Kawasaki Kisen Kaisha, LTD v. Regal-Beloit Corp.* ____ U.S. ____, 130 S. Ct. 2433, 2441 (2010) (explaining that under § 11706(c), Carmack "constrains carriers' ability to limit liability by contract").

Even though formal tariffs have been abolished in most instances, many rail carriers, including CSXT in this instance, continue to maintain tariff-like rate schedules based on the classification of goods to be shipped. Rate publications, price lists, or off-the-rack rate schedules, still commonly referred to as "tariffs," may be in brochure form and/or available online, are time-sensitive, and must be disclosed by the carrier upon request by a shipper or prospective shipper. Where, as here, a commercial shipper needs a rate quote for shipping a commodity such as an electrical transformer by rail, the shipper consults the selected carrier's current published circular or rates brochure or, if a printed rate schedule is not available, locates the published rate information online or directly contacts a representative of the carrier via telephonic or electronic means. *See* 49 U.S.C. § 11101 (b); 49 C.F.R. §§ 1300.2 & 1300.3.

Ordinarily, the price lists or off-the-rack rates cover *limited* carrier liability. That is, the standard published rates are relatively low and carry a commensurately low limitation of liability. In order to comply with Carmack, however, the carrier must afford shippers the option of choosing a higher rate in order to obtain full Carmack Liability.[6] *See, e.g., Hughes Aircraft*

---

> (3) A rail carrier providing transportation or service subject to the jurisdiction of the Board under this part may establish rates for transportation of property under which—
>
> (A) the liability of the rail carrier for such property is limited to a value established by written declaration of the shipper or by a written agreement between the shipper and the carrier . . . .

[6] This requirement to satisfy the exception to Carmack's full liability rule functionally is the same for motor carriers. *See* 49 U.S.C. § 13710 (a)(1); 14706 (c)(1)(A) & (B).

6

*Co. v. North Amer. Van Lines, Inc.*, 970 F.2d 609 (9th Cir. 1992*); Hansa Meyer Transp. GmbH & Co., KG v. Norfolk Southern Ry. Co.*, No. 8:06-CV-924, 2008 WL 2168760 (D.S.C. May 20, 2008). Federal regulations promulgated by the STB concerning availability of so-called published rates for rail carriers subject to 49 U.S.C. § 11101 (b), (c), (d) and (f), are found in 49 C.F.R. §§ 1300.1, *et seq.*

In this case, CSXT contends that its "published rates" for rail shipment of electrical transformers in March 2006, were contained in its Price List CSXT 4605 for the classification, "Machinery," effective December 14, 2005.[7] *See* McCauley Depo. [DE-52], Exh. 17. It is therein that CSXT purports to give sufficient notice of its $25,000 limitation of liability for shipments under those published rates. At page 10 under the heading, "Price Restrictions," the 4605 publication states, "Carriers' maximum liability for lading loss or damage will not exceed $25,000 per shipment. Full liability coverage is only available by calling your sales representative for a specific quote." That is, CSXT contends its publication, Price List CSXT 4605 Containing Prices on Machinery" (hereinafter "Price List 4605") in effect on March 24, 2006, contains the published rates that applied to ABB's transformer shipment and notice of the commensurate $25,000 limitation of liability thereunder. The publication explicitly provides that, unless the shipper calls its CSXT sales representative and obtains a specific shipping rate quote for full liability coverage, rail shipment by CSXT of an electrical transformer would be pursuant to Price List 4605's published rates and corresponding $25,000 maximum carrier liability for loss or damages. Whether its position is correct must be determined by careful

---

[7] Price List 4605 specifies on p. 12 that the Column Heading 5 price applies to items contained in "MACHINERY 2 of the Commodity List Section" for items shipped in "Flatcars" up to a "maximum weight of 199,999 lbs." The BOL here lists the transformer's weight as "166,822," and in the Product Value box, states "STCC # 36-129-11," which the court perceives to be the Standard Transportation Commodity Code Number description of the transformer. *See* Price List 4605, p. 5.

7

application of governing statutes and regulations, as well as the evidence of record concerning the transactions giving rise to this lawsuit.

### D. The Bill of Lading: Notice of and Agreement to Limitation

The issue whether or not the carrier of a land shipment of goods lost or damaged in transit effectively has limited its liability as required by the subsection (c) exception to Carmack Liability has generated no small amount of litigation. The undersigned has located more motor carrier cases than rail cases addressing the question, but the rationale for both modes is the same. For a number of years, courts employed what is known as the "four-point test" developed prior to repeal of the tariff system in the mid-1990's.[8] *See Hughes*, 970 F.2d at 611-12; *Anton v. Greyhound Van Lines*, 591 F.2d 103, 105-06 (1st Cir. 1978). After deregulation in the mid-1990's, when carriers were relieved of maintaining formal tariffs in most cases, the four-point test was tweaked to require that a carrier seeking to limit its liability (1) give the shipper a reasonable opportunity to choose between two or more levels of liability (one of which is full liability), *see OneBeacon Inc. Co. v. Haas Indus., Inc.*, 634 F.3d 1092, 1099-1100 (9th Cir. 2011); *Emerson Elec. Supply Co. v. Estes Express Lines Corp.*, 451 F.3d 179, 187 (3d Cir. 2006); (2) obtain the shipper's agreement as to his choice of liability; and (3) issue a bill of lading prior to moving the shipment that reflects the agreement. *See id.* (citing *Acro Automation Sys., Inc. v. Iscont Shipping Ltd.*, 706 F. Supp. 413, 415 (D. Md. 1989)).[9]

---

[8] The original four-point test required that, in order to limit its liability, a carrier must (a) maintain a tariff within prescribed guidelines of the ICC; (b) obtain the shipper's agreement as to his choice of liability; (c) give the shipper a reasonable opportunity to choose between two or more levels of liability; and (d) issue a receipt or bill of lading prior to moving the shipment. *Carmana Designs Ltd. v. North Am. Van Lines, Inc.*, 943 F.2d 316, 319 (3d Cir. 1991).

[9] Some courts have applied the following factors to determine whether a shipper had been provided "reasonable notice of the liability limitation and the opportunity to obtain information necessary to making a deliberate and well-informed choice:"
1. Whether the provision providing the limitation was specifically brought to the shipper's attention;
2. The shipper's sophistication;

8

E. <u>When Carmack "Protection" is Unnecessary</u>

While there is some suggestion of a general retreat from use of the four-point test in

Carmack litigation, *see* WESLEY S. CHUSED, THE EVOLUTION OF MOTOR CARRIER LIABILITY UNDER

THE CARMACK AMENDMENT INTO THE 21ST CENTURY," 36 Transp. L.J. 177, 200 (2009) (hereinafter

"CHUSED"), there is no need for the test *at all* in a case like this in which the shipper, rather than

the carrier, not only filled in the blanks of a standard form bill of lading but also drafted that

form and used it for years. The very purpose of Carmack and the associated regulations were "to

protect shippers from carriers who would take advantage of their own superior knowledge and

leverage when dealing with unwary shippers." *Siren, Inc. v. Estes Express Lines*, 249 F.3d

1268,1271 (11th Cir. 2001). It is not "proper or necessary to protect shippers from themselves."

*Id.*

## III. Factual Predicate

Both parties contend that the evidence of record demonstrates a lack of any genuine issue

of material fact. The deposition transcripts and other documentary evidence submitted in

support of the parties' cross-motions for summary judgment reveal the following facts that are

material to a determination whether CSXT effectively limited its liability to $25,000 as to the

subject shipment.

---

3. The shipper's abundant experience;
4. The shipper's extensive prior dealings with the carrier;
5. Whether the shipper drafted the shipping contract;
6. Whether the shipper directly negotiated the terms of the shipping contract; and
7. Whether the provision providing the limitation was specifically produced in the bill of lading.

*Comsource Indep. Foodservice Cos., Inc. v. Union Pacific RR Co.*, 102 F.3d 438, 444 (9th Cir. 1996) (cited with approval in *Hansa Meyer*, 2008 WL. 2168760, slip op. at *10). *See also Aida Dayton Tech. Corp. v. Trism Specialized Carriers, Inc.*, 178 F. Supp. 2d 505, 507 (D. Md. 2001).

9

A. Parties' Course of Dealing

The evidence that reveals the environment, history and context of this dispute best is discovered in the depositions of the parties' veteran employees – ABB's Craig S. Steffey and CXST's Joseph McCauley. Both fairly recently retired from their respective positions; Steffey had been ABB's traffic manager for decades, and McCauley had served as CXST's senior manager of freight claims for 24 years. *See* McCauley Depo. [DE-52], p.9. Both were familiar with the manner in which ABB and CXST had been arranging rail shipments of electrical transformers for years, both before and after the deregulation of the mid-1990's. *Neither Steffey nor McCauley purports to have first-hand knowledge of the events that gave rise to preparation of the bill of lading at issue in this litigation.*

### 1. ABB's Craig Steffey

Steffey began working for Westinghouse in about 1972, and continued with the company in transportation logistics as traffic manager after it was bought out by ABB in 1990. *See* Steffey Depo. [DE-55], p. 9. He accepted ABB's offer for early retirement in 2003, but continued to perform his duties until 2005 on a contract basis. *See id.,* p. 10. Steffey still was working with ABB in a different part of the building during the time when the events occurred giving rise to this litigation. *See id.,* p. 13.

During his long tenure with Westinghouse and then ABB, Steffey dealt with the major railroad lines in the United States, including CSXT, Norfolk Southern, Burlington Northern, Santa Fe, Union Pacific and Canadian National in arranging the transportation of large electrical transformers of high value. *See* Steffey Depo. [DE-55], p. 13. No longer strictly regulated by federal law after repeal of the ICA, rates and liability levels were negotiated between the contracting parties, but still were subject to the ICCTA, including the Carmack Amendment and federal regulations promulgated thereunder. The shipping rate – expressed in units of weight –

10

depended in part on the extent to which the shipper required the carrier to assume liability for loss or damage. The lower the shipping rate, the lower the carrier's liability.

To arrange for a shipment, Steffey contacted a marketing representative of the chosen rail company to request a "rate something less than tariff . . . [which] is usually a railroad publication . . . that basically states their rates that they want to charge, and terms and conditions and things like that." *Id.*, p. 14. Steffey never saw "a full tariff . . . book form," and never asked for a full tariff from any railroad. *Id.*, p. 15. He explained,

> when we began requesting rates or [a] rate quote, we had pretty good communication with the marketing folks and they would send us the two- or three, four-page . . . quote; they would fax it to us, and that would have the basic terms and conditions in that quote. And so we never really got to the full tariff, you know, rate and full tariff document.
>
> * * * * *
>
> Early on . . . in the early 90's . . . , we didn't have much of an issue with the railroad accepting full liability. I mean they just did it as a matter of fact, matter of course. They would give you a rate and the full liability was part of it. . . . Gradually, late 90's, we began to see the railroads . . . attempting to walk away from full liability, and be . . . trying to limit their liability. . . . . It generally started with a reduction from full liability to . . . like, [$]500,000, and then I believe the Norfolk Southern came in with [$]100,000 limit of liability, and then gradually, it worked itself down to I think where it is, what they like to see the limit be now is like [$]25,000.

*Id.*, pp. 16-17.

If ABB wanted to arrange a shipment for which the railroad would bear a risk of liability greater than $25,000, Steffey contacted the carrier's marketing representative who was readily available to indicate that ABB wanted the carrier to assume a particular level of liability, "and they would come up with a charge or a premium." *Id.*, p. 17. Initially, when the premium still was "reasonable," ABB would accept it and opt for full liability. *Id.* In that instance, the carrier told him "that we had to have the full liability spelled out on the bill of lading, and we had to have the value of it on the bill of lading. . . . And this was all by the marketing railroad person." *Id.*

11

Steffey explained that he "put [the value of the product] on the bills of lading that I participated in, [ ] as long as I had the price from the railroad for the full liability coverage." *Id.*, p. 18.

Over time, full liability rates increased to the point that the shipper often did not choose to purchase the full liability coverage; rather, ABB would request a lower shipping rate with correspondingly lower liability coverage and would insure the difference, if the "insurance risk management" team recommended it. *See id.*, p. 18. Also as time passed and electronic communication improved, the railroad marketing representatives became less and less visible, and it became more difficult for ABB to identify and make contact with the right person. *See id.*, pp. 20, 35-36. It was Steffey's practice to make contact by telephone to discuss rates and liability and to determine a price. *See id.* In 2005 and 2006, Steffey recalls that the railroads "were cutting their marketing people back . . . and making them cover more territory which means they have less and less time to, you know, devote to any given customer." *Id.*, p. 37. Difficulty notwithstanding, "we got it done." *Id.*, at pp. 37, 80.

During his deposition, Steffey was shown a series of 73 ABB bills of lading, most of which he had prepared. *See* Exs. 31-1 to 31-73, to McCauley Depo. [DE-52]. Some of the bills of lading bore the instruction "!!! FULL LIABILITY REQUIRED !!!" and some did not. Generally, Steffey just called the marketing representative "and he gave us the dollars, or the rate per hundred weight for the charges," *e.g.*, *id.*, p. 29. Although each bill of lading was unique, the deposition testimony and exhibits demonstrate, *generally*, if a shipment was "FOB destination" (meaning that ABB bore the risk of loss) and/or if the consignee had requested full liability, Steffey entered the instruction, "!!! FULL LIABILITY REQUIRED !!!" on the face of the bill of lading, as well as the weight, a rate code he had obtained from the carrier's marketing representative, and ABB's assertion of the product's value.[10] If the shipment was "FOB seller," or

_____

[10]  Steffey testified that it had been his practice for twenty years to always indicate ABB's valuation of the shipment on the bills of lading so that the carrier's personnel handling

12

"collect," or if the consignee had arranged the transportation directly with the carrier, Steffey generally selected a lower level of carrier liability and thereby obtained a lower shipping rate. Again, as the carrier's level of liability increased according to the shipper's instruction, so did the shipping rate. *See, e.g.*, McCauley Depo. [DE-52], p. 12-13.

Steffey's description of the parties' course of dealing is well-illustrated by the collection of 73 bills of lading used as exhibits during the depositions, and it comports generally with the governing statutory and regulatory scheme under Carmack. Steffey always was eventually able to contact a CSXT representative and express whether ABB elected to ship at a low rate under a limitation of liability or to pay a higher shipping rate to ensure full carrier liability. In the latter event, Steffey noted conspicuously on the face of the BOL, "FULL LIABILITY REQUIRED."

### 2. CSXT's Joseph McCauley

McCauley, a 40-year veteran of CSXT's claims department, was deposed by ABB's counsel on April 14, 2010. *See* McCauley Depo. [DE-52].[11] Although his job as senior manager of freight claims did not entail day-to-day communication with shippers in arranging shipments, he provided assistance to the marketing personnel in putting together limitations of liability and suggested language for use in claim liability contract language. *See id.*, p. 10. He was, however, familiar with the process of communication between the CSXT marketing representatives and shippers seeking to engage CSXT's services. His description of the shipping process during the relevant time is consistent with Steffey's.

> Well, normally the customer will furnish a request to the railroad telling them that they want to ship a particular item or freight, and they will indicate what they would like to do, whether they want to move it at full liability, limited liability or a partial limited liability. . . . After that is agreed, if it's in our price listings they can

---

the load would be aware it contained a very expensive item, and not just a load of grain or coal.

[11] McCauley is CSXT's designated corporate representative under FED. R. CIV. P. 30(b)(6), *see* McCauley Depo. [DE-52].

pick a price out of there, but normally most of our price listings cover limited liability. If they want a full common carrier liability, that has to be negotiated.

*Id.*, p. 11.

When asked how CSXT would respond if a shipper made a request "with [just] a value of the product," McCauley responded, "They wouldn't. [CXST] would just handle it as a normal shipment. If they're moving it under the tariff and it calls for limited liability and you don't request full liability, they would handle it as a limited-liability shipment." *Id.*, p. 12. It was his understanding that the "tariffs" contain provisions for both full and limited liability rates. *Id.*

Q. Okay. So if a shipper submitted a request saying, "I've got a million-five transformer," the CSX would just assume it was going to be shipped – barring any other information, it was going to be shipped with a lower limited liability?

A. Absolutely, because almost every tariff that I have ever reviewed moves on limited liability, and it says, "If you want full liability, you must contact us to acquire a rate."

*Id.*, p. 13.

McCauley was shown Exhibit 18, which is the BOL governing the 2006 shipment of ABB's transformer at issue here, *see id.*, pp. 13-14, and was questioned about his understanding of the terms. He explained that the shipping rates would have been contained in Price List 4605 that covers shipping of "Machinery." *See id.*, pp. 14, 17-18 & Exh. 17. CSXT's Price List 4605 is Exhibit 18 to McCauley's deposition.

Q. Okay. Can you show me in here where it would say that if ABB or another shipper wanted a higher limited liability, they need to contact CSX?

A. Yes. On Page 9, it starts with the paragraph that says, "Price Restrictions." The actual notation would be on Page 10 . . . which will say "Carriers' maximum liability for lading loss or damage will not exceed $25,000 per shipment. Full liability coverage is only available by calling your sales representative for a specific quote."

*Id.* In order to find Price List 4605, a shipper could retrieve it online or "contact his sales representative, who could give him the price list." *Id.* Later, however, McCauley testified, "I don't believe you can get a quote on-line for [full] liability for a transformer if it's a fluctuating

14

scale. They would *only put on-line the limited liability*. Then they would negotiate depending on the terms and conditions that . . . both sides want to set down." *Id.*, p. 26 (emphasis added). The "tariff itself," the Price List 4605, available online, alerts a shipper to contact a sales representative if the shipper wanted a higher limited liability; McCauley explained, "[y]ou would have to read the tariff." *Id.*, p. 27.

McCauley did not think CSXT would have been confused by the BOL's lack of any notation for "Rate Authority," because it has "received so many bill of ladings [sic] from ABB over the years." *Id.*, p. 22. He was unaware of any instance when ABB and CSXT operated under a shipping arrangement other than Price List 4605 without including a specific "full liability required" request on the bill of lading. *Id.*, p. 23.

> Q. I guess my question is: From this sheet [Exh. 18, the BOL], how would you know that ABB was agreeing to your limitation on liability?

> A. By the fact that they did not ask for full common carrier liability.

*Id.*

Summarizing a shipper's options for moving an electrical transformer with CSXT, McCauley explained, "4605 is the tariff the customer can move under. He can also request a price quote. He can also move them under contracts." *Id.*, p. 32. Asked if it was his understanding that "the default is that there's a limit of liability unless the shipper asks for something else," McCauley responded, "if that's how it's listed in the tariff, yes." *Id.*, p. 33. McCauley's explanation of the parties' lengthy rail shipping relationship and practice, and interpretation of terms contained in ABB's BOL generally was consistent with Steffey's.

15

B. <u>Brian Brueggeman and the BOL</u>

On March 24, 2006, ABB's traffic manager was Brian Brueggeman ("Brueggeman").[12] "Brueggeman came in as a new hire in . . . the summer of 2005,"and Steffey trained him to take the reins as ABB's traffic manager, but "[n]ot nearly as long as I wanted to. . . . It was approximately [for] five or six months." Steffey Depo. [DE-55], pp. 10, 11-12. Thereafter, Steffey continued to work with ABB on a different floor in a different part of the building, but was "around and available" between 2005 and 2008, to help had Brueggeman asked. *Id.*, p. 13.

Prior to employment with ABB to replace Steffey as traffic manager, Brueggeman had worked as a transportation analyst for a coal-producing company, with several trucking companies, and with Trane as its transportation analyst for 15 years. *See* Brueggeman Depo. [DE-50], p. 8. Brueggeman testified that he had started work as traffic manager for ABB in July 2005.

> I was the traffic manager here for this facility managing all the inbound and outbound carrier selection and routing, freight, bill, processing payment, negotiations, also any claims activity that were associated with our shipments. And then a year and a half ago, I went to work as the logistics manager for North America for the region for all – representing and working for all of the five divisions in ABB throughout the U.S., Canada and Mexico.

*Id.*

In 2006, when the events occurred that are the subject of this lawsuit, Brueggeman was for ABB the "one that would be most knowledgeable in terms of which carriers to use to route freight, how to route it, what mode was the right mode to use, making sure that the bill of lading was filled out properly and that the freight bills were received and processed and approved in a timely fashion so they could be paid." *Id.*, pp. 9-10. By March 2006, when he prepared the Bill of lading at issue here, "on the average, we shipped maybe three to four transformers a month,

---

[12]    Brueggeman is ABB's designated corporate representative under FED. R. CIV. P. 30(b)(6).

and out of those three to four transformers a month, maybe one a month might have been [transported by] CSX." *Id.*, pp. 22-23.

Brueggeman used ABB's computer program to prepare a standard ABB form bill of lading on or about March 24, 2006, for rail shipment of an ABB electrical transformer the company had built on order for Duquesene Electric. The transformer was to be shipped by CXST from ABB's facility in St. Louis, Missouri, to Duquesene's facility in Pennsylvania. The BOL he prepared is designated "MLL 9659." *See* McCauley Depo. [DE-52], Exh. 18, p. 2. It bears ABB's logo and identifies ABB as the "shipper." *Id.* The "consignee" is Duquesene Light Co. *See id.* Nothing on the face of the BOL indicates that CSXT is the carrier, but the fax cover page indicates that the BOL was faxed to the "Billing Center" at CSX Transportation on March 24, 2006, *see id.*, p. 1, and that fact is not disputed.

According to the BOL, the load is "prepaid" and consists of an ABB Electric Transformer weighing 166,822 pounds. The BOL lists the Clearance Value file number[13] for the load as "C0508-H-026,"and states the identification number of the impact recorder(s)[14] affixed thereto. The shipment is designated, "FOB destination," which means that the shipper, ABB, bears the risk of loss. *See* Steffey Depo. [DE-55], pp. 22-24. The box on the BOL form for "rate authority"

---

[13] The "clearance value" refers to the dimensions of the projected load based on measurements taken by "the clearance bureau," and other information provided from ABB's engineers. Brueggeman explained, "I requested a clearance file, it be open [sic] and generated, with the dimensions of the transformer typically six months prior to its shipping so that the railroad can look to make sure my transformer is not going to hit any signals or knock [out] any bridges. They open a specific case for file and assign a unique number to — every time I request one of those." Brueggeman Depo. [DE-59], p. 18.

[14] Grossly oversimplified, an impact recorder detects latitudinal and/or longitudinal shifts in the load by G-force and by date/ time during the transport. This load was equipped with one or more impact recorders.

17

is blank. Brueggeman explained that he "was not provided with information from the railroad that says[,] here's the rate authority." Brueggeman Depo. [DE-59], p. 19.[15]

The BOL box labeled "RAILROAD NOTE" contains the following preprinted notations:

!!! THIS IS A HIGH VALUE CLEARANCE LOAD !!!

!!! DO NOT FLAT SWITCH WITHOUT MOTIVE POWER ATTACHED !!!

!!! DO NOT HUMP UNDER ANY CIRCUMSTANCES !!!

Brueggeman's name appears below the preprinted BOL certification that "the above named materials are properly classified, described, packaged, marked and labeled, and are in proper condition for transportation, according to the applicable regulations of the Department of Transportation." There is no evidence to suggest that Brueggeman was under a time constraint when he prepared the BOL. In fact, Brueggeman recalled during his deposition that "our delivery date to the customer was not in jeopardy of being violated." Brueggeman Depo. [DE-59], p. 76.

ABB's computerized, preprinted BOL also contains the following preprinted boilerplate notices:

> The property described below, in apparent good order, except as noted (contents and condition of packages unknown), marked, consigned, and destined as indicated below, which said carrier (the word carrier being understood throughout this contract as meaning any person or corporation in possession of the property under the contract) agrees to carry to its usual place of delivery at said destination, if on its route, otherwise to deliver to another center on the route to said destination. It is mutually agreed, as to each carrier of all or any of said property over all or any portion of said route to destination, and as to each party at any time interested in all or any of said property, that every service to be performed hereinunder *shall be subject to all the terms and conditions the Uniform Domestic Straight Bill of Lading set forth (1) in Uniform Freight Classification in effect on the date hereof, if this is a rail or a rail-water*

---

[15]    Brueggeman responded that he had asked someone "on several occasions" about rate authority. "Q. Who did you ask? A. The clearance bureau, the people that do the rail clearance for me. Q. Do they typically give you the rate authority? A. You know, sometimes I've seen them do that, sometimes they haven't." Brueggeman Depo. [DE-59], p. 19.

18

*shipment*, or (2) in the applicable motor carrier classification or tariff if this is a motor carrier shipment.

> *Shipper hereby certifies that he is familiar with all the terms and conditions of the said bill of lading*, including those on the back thereof, *set forth in the classification or tariff which governs the transportation of this shipment, and the said terms and conditions are hereby agreed to by the shipper and accepted for himself and his assigns.*

(Emphasis added). Mid-page on the BOL form is a box, hereinafter referred to as the "Declared Value" box, containing the statement:

> NOTE - Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property.

> The agreed declared value of the property is hereby specifically stated by the shipper to be not exceeding $ .

There is a blank space following the $ sign on this BOL. Brueggeman testified that he attempted to insert the price of the transformer into the box, but ABB's computerized form would not permit him to type in that blank. *See* Brueggeman Depo. [DE-59], p. 15. He explained the locked Declared Value box was "one of the great mysteries of life," and there was "nobody that knows the answer to who filled this or who generated this form or created it." *Id.* p. 16.[16] Because he

---

[16] The Declared Value box may be a vestige of regulation-era Carmack practice by which, as consideration for a fixed shipping rate, the shipper stipulated to a specific value of the load. Under Carmack, a carrier could not limit its liability, but if a shipper agreed in advance to a stipulated value, he later was estopped to demand damages in excess of that sum if loss or damage were to occur. *Cf. The Ansaldo San Giorgio I v. Rheinstrom Bros. Co.*, 294 U.S. 494 (1935) (Harter Act admiralty case pre-dating COGSA, in which Court recognized, "[t]wo so-called valuation clauses have been in frequent use. One is a true limitation agreement. . . . . The other is a true valuation clause."). Perhaps, ABB's computer program had been designed to prevent entries from being inserted into the Declared Value box on the BOL form to avoid unintended application of the "true limitation agreement" principle by estoppel, as the benefit of that method of ascertaining damages inures only to the carrier and not to a shipper. *See id.*, p. 497. *See also George N. Pierce Co. v. Wells Fargo & Co.*, 236 U.S. 278 (1915) (Early Carmack case answering negatively the "question whether one who has deliberately and purposely, without imposition or fraud, accepted a contract of shipment limiting the amount of recovery to $50, which is the sun named in the filed tariffs as the amount of recovery in the absence of a declaration of a greater value on the part of the shipper, who is given the privilege of paying an increased rate and having the liability for the full value of the goods, is entitled in case of loss to

19

could not type in the locked box, Brueggeman inserted the transformer's price, $1,384,000, into a box lower down in the BOL labeled "Product Value."

At his deposition in May 2010, Brueggeman was shown the same series of the 73 old ABB form bills of lading that had been prepared, mostly by Steffey, before Brueggeman assumed the traffic manager position. As to none of those 73 bills of lading did Brueggeman know where the code for "Rate Authority" had come from or what shipping rate it represented, and he had no idea why some of the bills of lading bore the notation, "!!! FULL LIABILITY REQUIRED !!!", while others did not. *See, e.g., id.*, pp. 38, 56-57.

> Q. Were you aware that CSX has a tariff in the form of a rate price list on their website for machinery that contains a default limitation of liability of $25,000?
> A. In 2006, no, sir.
> Q. You had never heard of that?
> A. No, sir.

*Id.*, p. 24. He had never talked to a marketing representative from CSXT. *See id.* p. 24-25. He had looked all over CXST's "website and tried to find a lot of different things [but he did] not ever remember seeing a price list that they made available on the website for me to go and look at." *Id.*, p. 25. Although he admitted that it was part of his job to know what a shipment price would be, he stated that "[w]ith the CSX Railroad and with the UP Railroad and with the Norfolk Railroad and the BNS Railroad, I didn't know [the shipment price] until the invoice showed up." *See id.*, pp. 25-26.

Brueggeman stated that he never discussed with Steffey how to get the prices and tariffs from the railroads, *see id.* pp. 28-29, does not know that a CSX "Q" number references a rate authority, *id.* p. 30, and never had occasion to ship an item when the customer had negotiated a

---

recover the full value of the property.").

Regardless of ABB's rationale for blocking its agents' access to the Declared Value box on its form BOL, any risk resulting from Brueggeman's omitting entry of a figure therein is attributable to ABB as Brueggeman's employer and author of the form, not to CSXT.

rate with the railroad and provided a contract number, *see id*. pp. 32-33. He had never seen the CSXT Price List 4605, Exh. 17 to McCauley's Depo. [DE-52]. *See* Brueggeman Depo., p. 65. He does know that a "quote" is a request for a price in terms and conditions for movement of a shipment but is not sure how to obtain one, *see id*. p. 53, and never saw a CSXT Price List or phone number, *see id*. When Brueggeman trained the current transportation manager, he never instructed her to write on the bill of lading that full liability was required because "my assumption, when I declared the value, that's what the coverage was going to be." *Id*., p. 55. When asked who told him that writing the product value on the bill of lading was equivalent to declaring a value, he responded, "Probably Mr. Steffey." *Id*.

In short, Brueggeman testified that he knew he was supposed to place the product's value on the face of the BOL but ABB's computer form would not permit him to enter it in the box designated for "agreed or declared value" "when the rate is dependent on value." *See id*., pp. 15-16. Therefore, he inserted the price of the transformer, $1,384,000, in a different part of the BOL labeled, "Product Value." *See id*., p 15. He did not insert a request for full liability on the BOL, which does not contain any indication of a shipping rate, quote, or a code for "Rate Authority," although the shipment's weight is designated as 166,822 pounds. *See* BOL, Exh. 18, p. 2, to Steffey Depo. [DE-59].

Brueggeman is adamant that, by typing in the price of the transformer on a line titled, "Product Value," he was requesting and receiving full liability coverage for that sum from the carrier. *See id.,* pp. 16-17, 38.

> In my experience with dealing with all four of those major class-one railroads, I have always submitted and declared the value of the transformer, which is our sale price to our customer on that bill of lading. It is my understanding [the railroads] cover the full value of the shipment.

*Id.* p. 24. ABB relies on Brueggeman's testimony and the BOL, Exh. 18 to McCauley's Depo. [DE-59], for its position that CSXT bore the entire risk of any and all damage to or loss incurred by the transformer during the rail shipment at issue.

### C. A "Train Wreck"

Once the railcar carrying the transformer reached Duquesene's facility in Pennsylvania, it appeared that the load had sustained some sort of damage. The transformer itself was fully encased in a steel tank that had been welded onto the railcar bed and otherwise packaged and secured for the trip before leaving ABB's facility. *See* W. Ball Depo. [DE-53], p. 35. The cause and extent of damage, if any, to the transformer itself therefore was not readily apparent, and at ABB's request, CSXT shipped the load back to St. Louis at no charge. The parties and their opinion witnesses disagree when and how the alleged damage might have occurred.

ABB sought to recover from CSXT "actual damages" and losses it incurred as a result of the transformer's alleged damages and the costs of installing a replacement for Duquesene while repairs were made. ABB contends that initially, the parties were focused on causation, but that CSXT later asserted that the BOL as prepared by ABB provided for a low shipping rate for ABB and a commensurate $25,000 limitation of liability by CSXT in lieu of full Carmack Liability.

## V. ANALYSIS

Whether and to what extent a carrier has effectively managed to limit its liability for damage to cargo or freight it transports under a bill of lading is a question once described as "the fiercest battleground in Carmack Amendment litigation." CHUSED, 36 TRANSP. L.J. at 200. The starting point for analyzing this set of facts lies, not in the language of the Carmack Amendment itself, but in the reason it exists and the purposes it is intended to serve. Two purposes most frequently have been cited for the Carmack Amendment, first enacted in 1906. One purpose was " 'to relieve shippers of the burden of searching out a particular negligent carrier from among the often numerous carriers handling an interstate shipment of goods,' " *Union Pac. RR Co. v.*

*Greentree Transp. Trucking Co.*, 293 F.3d 120, 124 (3d Cir. 2002 ) (quoting *Reider v. Thompson*, 339 U.S. 113, 119 (1950)). The second oft-cited purpose was " 'to protect shippers from carriers who would take advantage of their own superior knowledge and leverage when dealing with unwary shippers.' " *F.M. Machine Co. v. R&L Carriers, Inc.*, No, 5:08CV2358 (N.D. Ohio June 15, 2009) (quoting *Siren*, 249 F.3d at 1271).

On the salient facts and applicable legal rationale, the court finds this case virtually indistinguishable from *Siren*. Siren, the shipper, had created and completed its own bill of lading form. On that form, Siren's agent indicated that the shipment was to move under "Class 85," but its agent who filled out the preprinted bill of lading had no idea what "Class 85" signified, and certainly did not know that Class 85 was a code "well understood throughout the trucking industry" to mean, *inter alia*, that the carrier's liability was limited to $11.87 per pound. *Siren*, 249 F.3d at 1268. The Eleventh Circuit panel cited the four-point test, but found no reason to apply it because "[t]his Court does not deem it proper or necessary to protect shippers from themselves." *Id.* p. 1271. The pivot point was the fact that the bill of lading at issue was a form created and drafted by the shipper, rather than the carrier. The shipper "[h]aving had the opportunity on its own form to secure greater protection . . 'cannot complain about the consequences of leaving the applicable spaces blank. . . . ' " *Id.*, citing *Mech. Tech., Inc. v. Ryder Truck Lines, Inc.*, 776 F.2d 1085, 1087 (2d Cir. 1985) (internal citation omitted).[17]

---

[17]    The Eleventh Circuit panel rejected the parties' focus on the absence in the bill of lading of incorporation by reference of the carrier's tariff terms. "Obviously, if Siren did incorporate the Estes tariff into the bill of lading, then Estes would prevail because the limitation of liability is found within that tariff." *Siren*, 249 F.3d at 1270. Here, unlike *Siren*, ABB effectively *did* incorporate CSXT's "tariff" and classification into ABB's own form BOL, and that "tariff" contained a limitation of liability and notice of both the choice and means of obtaining a rate quote for full Carmack Liability. *Siren* correctly applied the unremarkable legal maxim that the drafter of a contract " 'is ordinarily charged with knowledge of its terms and meaning.' " *Id.*, p. 1272 (quoting *Hughes*, 970 F.2d at 612).

23

Here, as in *Siren*, the shipper drafted and completed the BOL containing the terms and conditions of the shipment, which expressly included:

> that every service to be performed hereinunder *shall be subject to all the terms and conditions the Uniform Domestic Straight Bill of Lading set forth . . . in Uniform Freight Classification in effect on the date hereof, if this is a rail or a rail-water shipment . . .*
>
> > Shipper hereby certifies that he is familiar with all the terms and conditions of the said bill of lading, including those on the back thereof, set forth in the classification or tariff which governs the transportation of this shipment, and the said terms and conditions are hereby agreed to by the shipper and accepted for himself and his assigns.

Brueggeman testified at his deposition that there were no terms and conditions on the back of the BOL at issue here, but that he was familiar with the Uniform Domestic Straight Bill of Lading, of which there are "a couple different versions," and would need "to look at the book and reread it" to know the version referred to in the above-quoted excerpt from the BOL. *See* Brueggeman Depo. [DE-59], p. 13-14.

In fact, the "Uniform Bill of Lading set forth in . . . [the] Uniform Freight Classification in effect of the date hereof" ceased to exist in the mid-1990's when the ICC and formal filed tariffs were abolished by the ICCTA. *See, e.g., Tempel Steel Corp. v. Landstar Inway, Inc.*, 211 F.3d 1029, 1030 (7th Cir. 2000). In *Tempel*, the Seventh Circuit Court of Appeals was faced with similar verbiage, albeit on different facts, when a motor carrier sought to disclaim liability for the loss of cargo shipped from Ohio to Mexico. There, the bill of lading governing the shipment was prepared by the *carrier* and provided that the cargo was received, "subject to the . . . tariffs in effect" on the date of issue. As it turned out, the carrier had kept the referenced "tariff" in its own files and had not filed it with the government. Keeping in mind that the *bill of lading had been prepared by the carrier* in *Tempel*, the appellate panel's comments on the effect of deregulation and abolition of tariffs nevertheless are relevant and worth repeating here:

24

We doubt that this was a "tariff" in effect" in 1997. Until 1995 tariffs had legal effect; the filed-rate doctrine made it impossible for shippers and carriers to contract around them. . . . The ICC Termination Act . . . abolished the tariff filing requirement and the filed-rate doctrine, and it canceled the legal effectiveness of most exant tariffs. . . . Today carriers adopt standard contractual terms, which some call "tariffs" out of habit, but which have no effect apart from their status as contracts. [The carrier's] bill of lading probably should have been revised to say that it incorporates "standard terms" rather than "tariffs in effect"; had it done this, [the carrier] could have avoided [the shipper's] argument that no tariff is "in effect" today and that [the carrier's] therefore should be ignored. But it is clear what the bill of lading was getting at so we read its language as incorporating off-the-rack terms.

*Id.* at p. 1030. Suggesting that "[the carrier] should have written a better set of terms," the

*Tempel* court pointed out that, "[a]ping language from the Cretaceous period, [the carrier's bill

of lading] recites that it governs" only tariffs referring to a referenced ICC number,

notwithstanding that the ICC and its numbers had been abolished. *Id.*

Similarly, the "Uniform Freight Classification" incorporated by ABB into its BOL no

longer exists, but as in *Tempel*, it is clear what the BOL was getting at, and the language properly

is read as incorporating the carrier's "off-the-rack terms" and conditions. ABB has offered no

evidence to rebut CSXT's evidence, through McCauley's testimony, that the then-current Price

List 4605 was, and for some time had been, the applicable off-the-rack "tariff" (as that word

incorrectly but commonly still is used) for rail shipment of machinery. *See also, e.g., Valerus*

*Compression Svs. L.P. v. Lone Star Transport., LLC,* No. 10-C-517, 2011 WL 3566865, slip op. at

*1, *4 (E.D. Wis. Aug. 15, 2011) (shipper-prepared bill of lading stated the shipment was "'subject

to the classifications and tariffs in effect on the date of the issue of this Bill of Lading' " and

contained the shipper's certification that it was " 'familiar with all the bill of lading terms and

conditions in the governing classification' " that were agreed to and accepted by the shipper).[18]

---

[18]   The *Valerus* court queried, "If [the shipper] was not referencing and incorporating [the carrier's] classifications and tariffs, whose was it incorporating?" Noting further that bills of lading are contracts between the parties, the court observed that contract principles apply, including that "ambiguities are construed against the drafter." *Id.,* p. *4 (citations omitted). "[T]he only reasonable construction of the bill of lading is that it referenced and incorporated

25

## VI. SUMMARY

Unrebutted testimony produced by CSXT through McCauley establishes that the "classification or tariff which govern[ed] the transportation of this shipment" was the Price List 4605 publication in effect on March 24, 2006, that contained CSXT's published rates for rail transport of "Machinery," the classification covering electrical transformers. That publication and classification contained a $25,000 limitation of liability and notice of what the shipper must do in order to request full liability.

ABB both drafted and completed the BOL that was issued for the rail shipment at issue in this litigation. *See Sassy Doll v. Watkins Motor Lines, Inc.*, 331 F.3d 834, 839 (11th Cir. 2003) (explaining that "a shipper 'prepares' or 'drafts' the bill of lading for purposes of this rule when the shipper actually creates the bill of lading, not when it merely fills in the blanks on one the carrier has created") (quoting *Siren*, 249 F.3d at 1271-72). The BOL was ABB's own form bearing ABB's own logo and generated by ABB's own computer program. That standard ABB form, which Brueggeman (mostly) completed and executed on behalf of ABB, expressly states that the shipment "shall be subject to all the terms and conditions the Uniform Domestic Straight Bill of Lading set forth (1) in Uniform Freight Classification in effect on the date hereof . . . ." *See also* Brueggeman Depo., pp. 12-13. On the face of the BOL, Brueggeman on behalf of ABB "certifie[d] that he is familiar with all the terms and conditions of the said bill of lading, including those on the back thereof, set forth in the classification or tariff which governs the transportation of this shipment, and the said terms and conditions are hereby agreed to by the shipper and accepted for himself and his assigns." *See also id.*, pp.13-14. That Brueggeman did not contact a CSXT representative to request a rate quote or specify a level of liability coverage different from what was contained in Price List 4605 or declare on the BOL that "full liability is required," is

the classifications and tariffs of the carrier. . . . " *Id.*

consistent with ABB's certification of familiarity, agreement and acceptance of CSXT's then-current published "tariffs" and classifications.

The undersigned is familiar with the unpublished opinion in *Siemens Power Transmission & Distr. Inc. v. Norfolk Southern Ry. Co.*, No. 6:02-CV-1024-Orl-22KRS, 2006 WL 5110365 (M.D. Fla. Mar. 24, 2006), upon which ABB relies. In *Siemens*, a manufacturer/shipper's agent arranged with Norfolk Southern to ship an electrical transformer by rail from Norfolk to Titusville, Fla., during which transport the impact recorders allegedly registered severe g-loads on the equipment. *Id.*, p. *1. On remand from the Eleventh Circuit Court of Appeals,[19] District Judge Anne C. Conway concluded that Siemens was entitled to partial summary judgment as against Norfolk Southern on the railway's affirmative defense that its liability was limited to $100,000. The facts of that case and the court's treatment of them are materially distinguishable from the instant case.

First, in *Siemens*, the plaintiff/manufacturer, Siemens, hired an agent, Tranco, to make the shipping arrangements with Norfolk Southern. *See id.* Tranco's agent actually contacted by mail a Norfolk Southern representative with whom he was well-acquainted, and identified the cargo as a transformer, provided departure and destination locations, and furnished the transformer's weight and dimensions. *See id.* The letter did not mention the transformer's value. *See id.* A few days later, Norfolk Southern's agent telephoned Tranco's agent and provided a per hundred-weight price quote. Tranco's agent specifically recalled there having been *no* discussion of limitation of liability and that he believed the rate quoted was for full carrier liability; Norfolk Southern's agent did not remember whether liability limits were discussed during this conversation, although it was his practice to discuss limitation of liability

---

[19] *Siemens Power Transmission & Distrib., Inc. v. Norfolk Southern Ry. Co.*, 420 F.3d 1243 (11th Cir. 2005) (remanding upon finding shipper's notice of claim satisfied Carmack regulations).

27

when he provided rate quotes. *See id.* In the instant case, there was no communication *at all,* written or verbal, between the parties before Brueggeman submitted the BOL.

When the transformer was ready to ship several months later, Tranco prepared and issued a straight bill of lading, as usual. Unlike the instant case, Tranco *did* insert "$2.5 million" [20] into the space on the form bill of lading that bore the same language as that contained in ABB's BOL locked "declared value" box." *See id.,* p. *2. Tranco sent this bill of lading to Norfolk Southern, and the transformer began moving in mid-January. A couple of weeks later, Norfolk Southern "published" the rate quote for this shipment by generating a "price authority" document identified as "NSRQ 58414," with the effective date of February 3, 2000. This price authority document is the only document associated with the rail portion of the shipment that contained express limitation of liability language, but it was not signed by anyone.

In ruling that Norfolk Southern's purported limitation of liability was unenforceable, Judge Conway did not mention whether Tranco's bill of lading contained language incorporating any rate schedule or commodity classification, and likewise did not focus on the fact that the sophisticated shipper had prepared the bill of lading. Rather, the *Siemens* court found that no issue of genuine issue of material fact existed because (i) the bill of lading contained a specific statement by the shipper of the transformer's value (albeit inflated) in the space provided therefor; (ii) there was no written agreement between the parties to limit Norfolk Southern's liability; (iii) the bill of lading was the only document signed by Tranco, and it did not contain a limitation of liability; (iv) there was no evidence that Siemens accepted the terms of the "price authority," as that document was not signed and did not rise to the level of a contract; (v) the bill of lading was not issued prior to movement of the transformer; and (vi) Norfolk Southern's agent's reliance on his "general practice" due to his inability to recall the specific transaction did

---

[20]   The court noted this figure appeared to be an overstatement of the transformer's value.

not create a genuine issue of material fact in light of Tranco's agent's specific memory of there

having been *no* discussion of limitation of liability. *See id.*, pp. *2-*4. "Finally, the declaration of

value set forth in the bill of lading satisfies § 11706(c)(3)(A); it was effective to limit the

Railroad's liability to $2.5 million. Even if it was not, again, the parties never entered into a

written agreement limiting liability, leaving Siemens free to pursue the full measure of its

damages." *Id.*, p. *4. In contrast, here, it is factually and legally significant that the shipper itself

drafted and completed the BOL; that the "declared value" box on ABB's BOL form is blank; and

that ABB's BOL specifically incorporated the terms and conditions of the shipper's then-current

classifications and "tariffs." The court finds *Siemens* to be inapposite.

* * * *

Neither before nor after deregulation has Carmack's protective function been

necessitated or properly invoked where, as here, the shipper has drafted the bill of lading. *See*

*Mech Tech*, 776 F.2d at 1087 ("Having had the opportunity on its own form to secure greater

protection, [the shipper] 'cannot complain about the consequences of leaving the applicable

spaces blank . . . ."). A thorough analysis of the controlling statutes, their common law roots,

legislative history and regulations, and the cases that have interpreted them, convinces the court

that this commercial document, *drafted and prepared as it was by the shipper*, does not

implicate Carmack's fundamental ameliorative function.

> But here we do not have a devious carrier hoping to slip a quick one
> over on an unsuspecting shipper. Rather, it is the shipper's own
> agent who prepared the short form bill of lading on its own
> preprinted standardized contract form. If the shipper's agent
> thereby incorporated an industry-wide, indisputably legal, and
> federally sanctioned [provision], the shipper cannot now be heard
> to complain about it.

*Swift Textiles, Inc. v. Watkins Motor Lines, Inc.*, 799 F.2d 697, 703 (11th Cir. 1986); *see also EFS*

*Nat'l Bank v. Averitt Express, Inc.*, 164 F. Supp.2d 994 (W.D. Tenn. 2001); *Schweitzer Aircraft*

29

*Corp. v. Landstar Ranger, Inc.*, 114 F. Supp.2d 199 (W.D.N.Y. 2000) ( "This is not a case of an unsophisticated shipper. Schweitzer was not shipping lug nuts.") (internal citation omitted).

## VII. CONCLUSION

It is CSXT's position that Price List 4605's page 10 Price Restrictions satisfied its statutory and regulatory burdens of publishing and noticing shipping rates and establishing a low limitation of its liability thereunder, together with direction how a shipper may obtain a full liability rate quote. The court concludes that ABB has not demonstrated that it can refute CSXT's competent evidence, presented through depositions and affidavits, that:

- ABB both drafted and prepared the BOL at issue in this case;

- Price List 4605, effective December 14, 2005, was the published rate schedule (commonly still referred to as a "tariff") for Machinery, including the electrical transformer, in effect on the date the BOL was prepared and faxed to CSXT;

- Price List 4605 contained a limitation of liability of $25,000, together with notice that the shipper must contact the carrier's representative to obtain full liability coverage upon a specific quote;

- ABB did not contact CXST's representative or otherwise request full liability coverage;

- ABB's BOL incorporated by reference the terms and conditions of the carrier's then-effective "tariff" or classification; and

- ABB certified that it was familiar with all the terms and conditions of the BOL "set forth in the classification or tariff" governing the shipment, which terms and conditions incorporated by reference the "Uniform Domestic Straight Bill of Lading set forth . . . in Uniform Freight Classification in effect on the date hereof." Bill of Lading, Exh. 17 to McCauley Depo [DE-52].

In light of the parties' long course of dealing as outlined by their veteran employees, the express terms of the BOL drafted by ABB, the court perceives no *genuine* issue of *material* fact to have been generated by Brueggeman's sworn deposition testimony, and finds no merit in ABB's

30

arguments that are based on Brueggeman's alleged ignorance of the existence or contents of Price List 4605 and his demonstrated misperception of the purpose and import of ABB's BOL terms. ABB relied on its form BOL and Brueggeman's interpretation thereof at its peril; the letter of the law, supported by a common sense notion of fair play, requires that it bear the risk of so doing.

CSXT's Motion for Summary Judgment [DE- 48.2] is ALLOWED as to its affirmative defense of limitation of liability and its contention that ABB's state claims are preempted by the Carmack Amendment. ABB's alternative state law claims hereby are DISMISSED.

The court still is analyzing CXST's Motion for Summary Judgment [DE-48.1] as to causation and damages pursuant to Carmack, and an order on that motion will issue as soon as possible. Regardless of the outcome, however, CSXT's liability for damages, if any, is limited to $25,000.

ABB's Cross-Motion for Partial Summary Judgment [DE-75] is DENIED.

Trial on the issues of causation and damages is set for this court's **May 14, 2012**, term of court. The Clerk of Court is directed to continue management of this matter.

SO ORDERED.

This, the __22__ day of March, 2012.

_James C. Fox_
JAMES C. FOX
Senior United States District Judge

31